IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ACC CAPITAL CORPORATION, f/k/a/ ANEMBAL CAPITAL CORPORATION<br><br>       Plaintiff,<br><br>vs.<br><br>BIOSCAN, INC.,<br><br>       Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No.  2:04CV322DAK |

   This matter is before the court on Defendant Bioscan, Inc.'s ("Bioscan") two Motions for Partial[1] Summary Judgment on Plaintiff ACC Capital Corporation's ("ACC") claims for conversion, breach of Uniform Commercial Code ("UCC") obligations, fraud, and negligent misrepresentation, and on ACC's Motion to Strike.  A hearing on the motions was held on January 18, 2005.  At the hearing, Bioscan was represented by Melvin D. Honowitz, John A. Pearce, and Billie Siddoway, and ACC was represented by John P. Ashton.  Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.  Since taking the motions under advisement, the court has further considered the law and facts relating to the motions.  Now being fully advised, the court enters the following Memorandum Decision and Order.

---

[1] While these are separate motions for *partial* summary judgment, there are no other pending claims.

## I.  BACKGROUND

ACC is a Utah corporation engaged in the business of originating equipment leases and assigning leases to banks and other secondary market funding sources.  Specifically, ACC drafts the documents used in a lease transaction, buys equipment from a supplier, leases the equipment to a lessee, and then assigns some or all of its rights in the lease to an assignee or funding source (a process known as a "discounting transaction").  In a typical discounting transaction, ACC assigns its right in the rental stream to the funding source in exchange for cash equal to the present value of future rentals while retaining residual rights to the leased equipment at the end of the lease term.

In June 2001, an outside lease broker referred a potential discounting transaction ("the Lease Transaction") to ACC for the placement of various equipment in a medical imaging center in Las Vegas, Nevada.  On June 5, 2001, based on the broker's referral, ACC submitted a proposal ("the Proposal") outlining the Lease Transaction to EDX Management, Inc. ("EDX"), a medical practice management company and owner/manager of numerous medical imaging centers around the country, and New Millennium Technologies, Inc. ("New Millennium"), a software development company turned medical practice management company.  EDX and New Millennium had established a joint venture for the purpose of acquiring and developing additional medical imaging centers and to manage EDX's existing imaging centers.  The venture was incorporated as Lakes Medical Investment Holding Corporation ("LMI") in June of 2001.  The Proposal submitted by ACC was accepted on June 19, 2001.

In order to secure financing, ACC submitted a Transaction Summary outlining the Lease

Transaction to Valley Bank, a Nevada Banking Corporation, on August 14, 2001. The equipment that is the subject of this litigation is a GE Prospeed CT scanner ("the Scanner"). Under the Lease Transaction, the Scanner was to be (1) purchased by XCONNX, Inc. ("XCONNX"), the vendor supplying the Scanner, from Bioscan, a buyer and seller of medical radiology/imaging equipment; (2) sold to ACC; and then (3) leased to EDX, New Millennium, and LMI (collectively "Lessees") for 60 months. ACC would assign 58 of the rental payments to Valley Bank ("Assignment") at a negotiated discount, keep the first and last months' rent to be paid in advance, and retain residual rights to the equipment at the end of the lease term. On August 30, 2001, Valley Bank issued a loan commitment to ACC in the amount of $1,275,000.[2]

Also on August 30, 2001, ACC issued a "Commitment relative to lease transaction" ("Commitment") to Lessees which provided, in part,

> THIS COMMITMENT IS BEING PRESENTED AS A LETTER OF INTENT SUBJECT TO THE FOLLOWING:
> 1. Final credit approval[] by [ACC] and/or [its] Assignee/Nominee.
> 2. No material adverse change[] shall have occurred in the business, properties or financial condition of the lessee, the guarantor(s) or any party related to this transaction
> 3. Documentation satisfactory to [ACC].

The Commitment was accepted by Lessees on August 31, 2001.

On September 4, 2001, ACC and Lessees entered into a Master Lease Agreement which set forth the specific terms of the Lease Transaction. On that same date, ACC and Lessees also entered into a Progress Funding Agreement at Lessees' request whereby ACC would advance

---

[2] While this amount includes financing for the Scanner plus additional medical and office equipment, this litigation involves only the Scanner.

funds to XCONNX before XCONNX delivered the Scanner.

After September 4 but before September 14, 2001, an ACC employee notified ACC's CEO, Loni Lowder ("Lowder"), that XCONNX and EDX may have the same Las Vegas address. This information triggered a concern in Lowder's mind that the Lease Transaction may not be at arm's length. As part of its investigation concerning the relationship between EDX and XCONNX, ACC asked XCONNX for the names of two of its suppliers, one of which was Bioscan. ACC then contacted Bioscan and requested a trade reference for XCONNX.

However, before ACC contacted Bioscan, Roy Shapiro, EDX's Agent ("Shapiro"), contacted Lee Neuman ("Neuman"), the Vice President of Bioscan, and requested that Neuman prepare an invoice for the Scanner to XCONNX instead of to EDX. Neuman testified that he did not know what XCONNX was, but that "Mr. Shapiro/EDX, . . . told me that XCONNX was affiliated with him and that I would be getting this request for a credit reference." Shapiro indicated that "XCONNX was somehow related to this transaction, that XCONNX and EDX were tied together, and that it would help him greatly if I was able to complete my credit reference for him." When Neuman received the trade reference, he filled it out and sent it back to Lowder by fax on September 14, 2001. Neuman indicated on the trade reference that Bioscan had a trade relationship with XCONNX dating back to July 2000, XCONNX's payment history was "good" on "30 day net terms," XCONNX's current balance with Bioscan was zero, and XCONNX had a high credit with Bioscan of $200,000. Neuman, however, admitted at his deposition that as of the date the trade reference was submitted to ACC, EDX owed over $207,000 to Bioscan.

Lowder contends that after receiving the fax he telephoned Neuman[3] wherein Neuman told him that Bioscan "had worked with XCONNX for a number of years and had maintained a satisfactory relationship with XCONNX involving [Bioscan's] sale of medical equipment to XCONNX for resale." While Bioscan had done business with EDX, Bioscan had never sold equipment or opened an account with XCONNX, nor had XCONNX ever been an equipment purchasing customer of Bioscan. Lowder does not recall telling Neuman that this was a transaction involving EDX, LMI, or New Millennium or the amount of the financing; nor does he recall asking Neuman if he was familiar with the Scanner that ACC was purchasing from XCONNX. Lowder, however, stated that he asked Neuman whether there was any connection between Shapiro and XCONNX and that Neuman had said there was not. Neuman contends that he received a phone call regarding XCONNX but does not remember anything about the call.

On September 14, 2001, ACC requested and received affidavits from Lessees stating that the respective entities and their "officers, directors, shareholders or affiliates do not hold and have not held a direct or indirect ownership interest or affiliation in XCONNX." ACC further requested and received a bank reference from Centrua Bank regarding XCONNX which indicated that XCONNX had an average checking account balance of $2471 and a money market account with a current balance of $1,000,000.

On September 20, 2001, ACC requested proof of XCONNX's ownership of the Scanner in the form of a bill of sale or paid invoices from XCONNX's seller with the price redacted if

---

[3]In a previous deposition, Lowder states that he did not recall whether he talked to Neuman at Bioscan but that he asked to talk to a manager.

XCONNX so required.  This inquiry by ACC gave rise to a threat by a person purporting to be a representative of XCONNX who was concerned that ACC would do an end run around XCONNX and deal directly with Bioscan.  ACC received a bill of sale from XCONNX showing XCONNX as seller and ACC as buyer of the equipment.  ACC, however, never obtained a bill of sale from Bioscan or other entity demonstrating the manner by which XCONNX acquired title to the equipment.

On September 20, 2001, ACC issued wire instructions authorizing a progress payment of $637,500 to XCONNX which was wired out the following morning.  Lowder testified that "Mr. Neuman's telephonic representations and the faxed trade reference report were essential inducements to, and the lynchpin of, my decision to cause [ACC] to provide progress funding to XCONNX."

At the same time that ACC, Lessees, and Valley Bank were processing the Lease Transaction and unbeknownst to ACC and Valley Bank, EDX and Bioscan had entered into a contract ("Purchase Agreement") whereby EDX would purchase the Scanner directly from Bioscan.  The Purchase Agreement provided that the "order shall not become a binding contract to furnish the equipment described herein unless and until accepted in writing on the face hereof by an authorized agent of [Bioscan] and upon receipt of the deposit specified herein."

Because Shapiro had indicated to Neuman that in order to secure the funding, the Scanner needed to be delivered, Bioscan delivered the Scanner to Lessees' facility in Las Vegas prior to receiving any payment.  Shortly thereafter, Bioscan informed EDX that because the facility was still under construction and Bioscan was concerned that the Scanner could be damaged, it wanted

to remove the Scanner and provide EDX with a different scanner upon completion of the facility. EDX agreed, and twenty days after delivery, Bioscan removed the Scanner. Bioscan then sold the Scanner to a third party in Bangladesh. EDX never requested a replacement scanner from Bioscan.

Unaware that EDX had purchased the Scanner directly from Bioscan, ACC authorized the progress funding payment to XCONNX for purchase of the Scanner. Upon receiving information that the Scanner had been delivered, a representative of ACC traveled to Lessees' Las Vegas facility and confirmed its presence. Shortly after Bioscan removed the Scanner, Lessees defaulted in their obligations under the Lease Agreement and ceased doing business, while all personal guarantors filed bankruptcy petitions.

On July 31, 2002, Valley Bank filed an action ("Valley Bank Litigation") in Utah state court against ACC, EDX, LMI, New Millennium, and various individuals, including Shapiro, for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, and negligence. On December 10, 2003, ACC and Valley Bank entered into a Settlement and Release Agreement ("the Settlement"), and the claims against ACC were dismissed with prejudice. Pursuant to the Settlement, Valley Bank assigned to ACC any claim that it has or may have against any named defendants, Bioscan, or Neuman. ACC then filed the instant action in Utah state court alleging fraud, conversion, negligent misrepresentation, and breach of UCC obligations. Bioscan removed this case to federal court and now moves for summary judgment on all of ACC's claims.

## II. STANDARD OF REVIEW

A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate when the pleadings, depositions, and affidavits on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. "As a matter of law, the movant must show entitlement to summary disposition beyond all reasonable doubt." *Alta Health Strategies, Inc. v. Kennedy*, 790 F. Supp. 1085,1089 (D. Utah 1992) (quotations and citations omitted). Thus, the movant bears an initial burden to demonstrate an absence of evidence to support an essential element of the non-movant's case. If the movant carries its initial burden, the burden then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of that element. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

A genuine dispute exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "Where different inferences can be drawn from conflicting affidavits, depositions and pleadings, summary judgment should not be granted." *Alta Health Strategies, Inc.*, 790 F. Supp. at 1090 (quotations and citations omitted).

## III.  DISCUSSION

### A.  Conversion and UCC

Bioscan asserts that this court should grant its Motion for Summary Judgment on ACC's conversion and UCC claims because, at all relevant times, Bioscan lawfully held title to the Scanner.  To prevail on a claim of conversion, ACC must demonstrate that Bioscan engaged in "an act of willful interference with a chattel, done without lawful justification by which the person entitled thereto is deprived of its use and possession."  *Benton v. State of Utah*, 709 P.2d 362, 365 (Utah 1985) (defining the doctrine of conversion).  "The general rule is that an action for conversion is not maintainable unless the plaintiff, at the time of the alleged conversion, is entitled to immediate possession of the property."  *Id.* (quotations and citations omitted).

ACC contends that it had a right to possession of the Scanner at the time Bioscan repossessed it because under the Purchase Agreement between Bioscan and EDX, title had passed from Bioscan to EDX (and thus XCONNX) upon delivery.  ACC further asserts that because XCONNX held title to the Scanner, it was able to sell it to ACC and did so as evidenced by the bill of sale delivered by XCONNX to ACC.  Accordingly, ACC concludes that Bioscan's repossession of the Scanner was unlawful conversion.

The court, however, agrees with Bioscan.  Because the effectiveness of the Purchase Agreement was conditioned on (1) EDX's payment of a $75,000 deposit to Bioscan and (2) Bioscan's signature, neither of which occurred, Bioscan never became contractually bound to furnish the Scanner to EDX.  Bioscan retained title to the Scanner, and thus, ACC's claim for conversion fails as a matter of law.  Accordingly, Bioscan's Motion for Partial Summary

Judgment as to ACC's conversion claim is granted.

Bioscan further contends that because it held title to the Scanner at the time it repossessed the Scanner, it was not required to give notice to other creditors under the UCC. The UCC requires that a secured party give notice to another secured party when (1) foreclosing on collateral or (2) accepting collateral in satisfaction of a debt. *See* Nev. Rev. Stat. §§ 104.9611, 104.9621.[4] Thus, Bioscan concludes that ACC's UCC claim fails because Bioscan lawfully had title to the Scanner and was not engaged in the process of foreclosure or acceptance in satisfaction of a debt.

ACC asserts that Bioscan's alleged fraud against ACC prevents it from claiming any UCC priority. *See Ninth District Production Credit Assoc., v. Ed Duggan, Inc.*, 821 P.2d 788, 794 (Colo. 1991) (observing that in appropriate cases the UCC "provides for the application of equitable principles in cases governed by Article 9"); *Peerless Packing Co., Inc. v. Malone & Hyde, Inc.*, 376 S.E.2d 161, 164 n.4 (W. Va. 1988) (noting that in certain cases some courts have allowed equitable claims to disturb a secured creditor's priority in UCC cases where there was evidence of fraudulent conduct). ACC contends that it would inequitable to allow Bioscan to profit from its fraudulent conduct.

To establish that ACC was unjustly enriched, it must demonstrate that Bioscan (1) received a benefit conferred by ACC, (2) had an appreciation of such benefit, and (3) accepted and retained such benefit under circumstances such that it would be inequitable to retain the

---

[4]Because the Scanner was located in Las Vegas, Nevada law governs the priority and perfection of security interests under the UCC. *See* Nev. Rev. Stat. § 104.9301.

benefit. *See Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12, 1975*, 942 P.2d 182, 187 (Nev. 1997). Bioscan, however, did not benefit from the alleged fraud because it never accepted or retained any payment for the Scanner. Bioscan merely repossessed property for which it held title. Therefore, the court concludes that ACC's UCC claim fails under a theory of unjust enrichment. Accordingly, Bioscan's Motion for Partial Summary Judgment as to ACC's UCC claim is granted.

### B. Fraud and Negligent Misrepresentation

Bioscan asserts that this court should grant its Motion for Summary Judgment on ACC's fraud and negligent misrepresentation claims because there are no genuine issues of material fact that would preclude judgment in Bioscan's favor. ACC contends, however, that because there are numerous issues of disputed material fact, this is not one of those rare circumstances in which claims of fraud and misrepresentation can be resolved by summary judgment. *See Alta Health Strategies, Inc.*, 790 F. Supp. at 1093 ("[A]llegations of fraud do not lend themselves readily to resolution by way of summary judgment." (quotations and citation omitted)).

In order to succeed on a claim for fraud, a plaintiff must establish the following elements:

> (1) That a representation was made; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.

*In re Ogden*, 314 F.3d 1190, 1198 (10th Cir. 2002) (quotations and citations omitted). Similarly, negligent misrepresentation is a form of fraud which occurs when

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by the justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Atkinson v. IHC Hosp., Inc.*, 798 P.2d 733, 737 (Utah 1990) (quoting Restatement (Second) of Torts § 522 (1977)).

Intent of the representor is an essential element in a claim for fraud but not for negligent misrepresentation. Thus, in a fraud claim, "the plaintiff must show that the representations were known to be false or were made when the representor knew he had insufficient information." *Alta Health Strategies, Inc.*, 790 F. Supp. at 1094. For a claim of negligent misrepresentation, the representor need not know that the information is false but "[t]he law imposes on him the duty to reasonably assure the accuracy of what he represents, because of his superior position to obtain the needed knowledge and his pecuniary interest in the transaction." *Id.* At 1095 (quotations and citations omitted). In the instant case, Neuman testified that he knew the representations he was making about XCONNX in the trade reference were false–he had never had any dealings with XCONNX, only with EDX. Nevertheless, Neuman indicated on the trade reference that Bioscan had a trade relationship with XCONNX dating back to July 2000, XCONNX's payment history was "good" on "30 day net terms," XCONNX's current balance with Bioscan was zero, and XCONNX had a high credit with Bioscan of $200,000. At the time Bioscan completed the trade reference, however, EDX owed Bioscan over $207,000.

In a claim for fraud, a representation is considered material "if the victim believed the misrepresentation to be true, and included it as a factor in the decision-making process." *Id.*

(quoting *Utah v. LeFevre*, 825 P.2d 681, 687 (Utah Ct. App. 1992)).  Lowder testified that he believed the trade reference to be true and that he had included it as a factor in whether or not go forward with the transaction.  Neuman also testified that he knew the trade reference was "one factor a person would use in evaluating the creditworthiness of a customer."

Bioscan, however, contends that no reasonable fact finder could conclude that ACC's reliance on the alleged misrepresentation was reasonable because (1) ACC was contractually bound prior to receiving the reference, (2) ACC considered information from numerous sources when it committed to the Lease Transaction, and (3) ACC failed to comply with its duty to investigate its suspicions of fraud.  While ACC received Valley Bank's loan approval and sent the Commitment to the Lessees on August 30, 2001, language in the Commitment demonstrates that it was a "letter of intent subject to . . . final credit approval, . . . no material adverse change[, and] . . . documentation satisfactory to [ACC]."  In addition, the Progress Funding Agreement provided that the decision to make any progress payments is subject to ACC's "sole discretion" and "conditions precedent" including the delivery of all documents and instruments which ACC "may reasonably request and the completion of all acts which [ACC] may reasonably request from Lessee or Vendor."  Accordingly, ACC was not contractually bound when Bioscan submitted the trade reference on September 14, 2001.

ACC also asserts that it did not fail in its duty to investigate.  Specifically, ACC contends that under the specific terms of the Assignment, Valley Bank was responsible to "independently and without reliance upon [ACC] conduct its own credit evaluation, review such information as it deemed adequate and appropriate and make its own analysis of the Lessee(s) and the Lease."

Thus, ACC concludes that in making its decision to advance the progress payment, it was appropriate for ACC to rely on Valley Bank. ACC further argues that it is standard practice in its industry for a party submitting these trade references to rely on the truthfulness of the references and to consider them as part of a package of information to be used in considering whether to extend credit.

Whether or not it was reasonable for ACC to rely upon Bioscan's trade reference and whether or not ACC did, in fact, rely upon it are issues to be decided by a jury. Thus, the court concludes that it would be inappropriate to grant summary judgment on ACC's fraud and negligent misrepresentation claims. Accordingly, Bioscan's Motion for Partial Summary Judgment on ACC's fraud and negligent misrepresentation claims is denied.

### C. Motion to Strike

Pursuant to Federal Rule of Civil Procedure 12(f), ACC filed a Motion to Strike portions of Bioscan's reply memoranda. ACC contends that because Bioscan waited until its most recent filings to introduce evidence that it could have presented in its original motion, that evidence should be stricken. ACC further argues that Bioscan misstates the testimony of a former ACC employee and, thus, Bioscan's allegations regarding that testimony should be stricken. The court, however, declines to do so. Even if the court did strike Bioscan's memoranda, it would not have affected the court's rulings on Bioscan's motions. The court also refuses to strike Bioscan's rule 26(a)(3) disclosures of designated witnesses and use of deposition transcripts from the Valley Bank Litigation.

## IV.  CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion for Partial Summary Judgment (Issues: Conversion & UCC) [docket #38] is GRANTED, Defendant's Motion for Partial Summary Judgment (Issues: Fraud and Negligent Misrepresentation) [docket #40] is DENIED, and Plaintiff's Motion to Strike [docket #66] is DENIED.

DATED this 29th day of March, 2006.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge